IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JONATHAN TALLMAN**, | Case No. 2:23-cv-1592-HL |
| Plaintiff, | **ORDER** |
| v. | |
| **MICHAELA MILLER**, | |
| Defendant. | |

**Michael H. Simon, District Judge.**

Plaintiff Jonathan Tallman ("Tallman") lives in the city of Boardman, Oregon, in Morrow County. He owns and operates a coffee shop in Boardman called, "The Farmer's Cup." ECF 1-1 at 2. In November 2020, Tallman ran for election for the office of Mayor of Boardman but did not win. ECF 11-1 at 2. In May 2021, Tallman ran for election for a seat on the Port of Morrow Board of Commissioners but did not win. *Id.* In November 2022, Tallman ran for election for a seat on the Boardman City Council but did not win. *Id.* In May 2023, Tallman again ran for election for a seat on the Port of Morrow Board of Commissioners but did not win. *Id.*

Defendant Michaela Miller ("Miller") grew up in Boardman. In approximately April 2019, she began working at The Farmer's Cup, as a server. She was 16 years old. Tallman hired Miller and was her supervisor. ECF 7 at 1. Shortly after she began working for Tallman, Miller

PAGE 1 – ORDER

"experienced what [she] now know[s] to be highly inappropriate behaviors from a 40-year-old man toward a 16-year-old girl." *Id.* at ¶ 6. She describes that behavior in detail in her declaration. *Id*. at ¶¶ 6-19. She adds that "Tallman would only engage in these behaviors when there wasn't another adult present" and that she "did not feel safe working with Tallman." *Id*. at ¶¶ 14, 19. She also witnessed a friend and co-worker experience similar behavior from Tallman. *Id.* at 18. In August 2019, Miller and her friend were at sports practice. They discussed Tallman's behavior and were overheard by their coach, who was a mandatory reporter under Oregon law. The coach reported what he had heard to the Boardman Police Department. Shortly thereafter, Miller, accompanied by her parents, was interviewed by the Boardman Police, who prepared a report. *Id*. at ¶¶20-22. No charges were ever brought against Tallman. ECF 11-1 at 15. In 2022, Miller left Boardman and moved to Washington. ECF 7 at ¶ 2.

In August 2023, Frankie Nuñez Lezama either posted or shared the police report on Facebook. ECF 7 at 12. Shortly thereafter, Miller responded on Facebook with her own posting, commenting on the police report and thanking the Nuñez family for their support. *Id*. at ¶¶23-25; *see also id.* at 11. Later, Miller reposted this content on the New Boardman Community Facebook page and on her own Facebook page. *Id.* at ¶¶ 26-27.

One month later, in September 2023, Tallman sued Miller in state court, asserting Oregon common law claims of defamation, defamation per se, and false light invasion of privacy. ECF 1-1. Miller timely removed the case to federal court and then filed a motion to strike, under Oregon's Anti-SLAPP statute, Or. Rev. Stat. § 31.150. ECF 6. Miller's motion was fully briefed, and United States Magistrate Judge Andrew Hallman heard oral argument.

On September 17, 2024, Judge Hallman issued his Findings and Recommendation. ECF 27. Judge Hallman recommended that this Court deny Miller's motion to strike and also

deny Tallman's motion for attorney's fees. Miller timely objected (ECF 29), and Tallman responded (ECF 31). Under the Federal Magistrates Act, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects to a magistrate judge's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3). The Court has reviewed de novo the underlying briefing and related evidentiary material and has considered Judge Hallman's Findings and Recommendations and the parties' objections and responses.

The threshold question that must be answered before deciding Miller's motion to strike is whether Tallman is a public figure for purposes of federal constitutional analysis. Although Tallman's claims of defamation, defamation per se, and false light invasion of privacy are all brough under the common law of Oregon, it is "well established that state law defamation actions can be affected by the First Amendment rights of speakers." *Lowell v. Wright*, 369 Or. 806, 815 (2022). Indeed, as the Oregon Supreme Court has explained, if the plaintiff is a public figure for purposes of federal constitutional analysis, the plaintiff "must prove the false and defamatory statements were published with actual malice; *i.e.*, knowledge of falsity or reckless disregard of truth." *Bank of Or. v. Indep. News, Inc.*, 298 Or. 434, 441-42 (1985) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).

In 1971, the U.S. Supreme Court considered a lawsuit brought by Alphonse Roy, an unsuccessful primary candidate in an election for the U.S. Senate. The Concord Monitor, a daily newspaper in Concord, New Hampshire, published by the Monitor Patriot Co., ran a column shortly before an election that referred to Roy as a "former small-time bootlegger." The column was distributed by the North American Newspaper Alliance (NANA). After losing the primary

election, Roy sued both the Monitor's publisher and NANA in state court, alleging defamation. Roy prevailed, the New Hampshire Supreme Court affirmed, and the U.S. Supreme Court reversed. *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971).

As the Supreme Court explained:

> In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, we held that the First and Fourteenth Amendments require a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. . . . The approach of *New York Times* was to identify a class of person— there public officials—and a type of activity—there official conduct—and to require as to defamations respecting them a particularly high standard of liability—knowing falsehood or reckless disregard of the truth. *Later cases have made it clear that the applicability of this basic approach is not limited to those in public office or to the performance of official acts, or, for that matter, to conventional civil libel suits*.

*Roy*, 401 U.S. at 270-71 (quotation marks omitted) (emphasis added). The Court added: "Given the later cases, it might be preferable to categorize a candidate as a '*public figure*,' if for no other reason than to avoid straining the common meaning of words." *Id.* at 271 (emphasis added).

The Supreme Court further noted that "anything which might touch on an official's fitness for office is relevant." *Id*. at 273. The Court continued:

> Indeed, whatever vitality the 'official conduct' concept may retain with regard to occupants of public office, it is clearly of little applicability in the context of an election campaign. The principal activity of a candidate in our political system, his 'office,' so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him.

*Id.* at 274 (citation omitted). Further, "[a]ny test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase 'official conduct.'" *Id.* The Court concluded:

> We therefore hold as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co. v. Sullivan*.

*Id.* at 277.

Eighteen years after the Supreme Court decided *Roy*, it addressed another libel suit brought by another *unsuccessful* candidate for public office. In this case, an unsuccessful candidate for a state judicial office brought a libel action against a newspaper. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989). Daniel Connaughton was the unsuccessful candidate for the office of Municipal Judge of Hamilton, Ohio. He sued the publisher of a local newspaper that supported the reelection of the incumbent, James Dolan. Shortly before the election, one of Dolan's staff members resigned and was arrested on charges of bribery. The newspaper ran a front-page story quoting a witness who testified before the grand jury that Connaughton offered the witness and her sister jobs and a trip to Florida "in appreciation" for their help in investigating Dolan's former staff member. *Id.* at 660.

Throughout the Supreme Court's opinion, the Court referred to Connaughton as a "public figure," even though he was only an unsuccessful candidate. The Supreme Court also stated:

> There is little doubt that public discussion of the qualifications of a *candidate* for elective office presents what is probably the strongest possible case for application of the *New York Times* rule, and the strongest possible case for independent review.

*Id.* at 686-87 (quotation marks and citation omitted) (emphasis added). The Supreme Court then quoted the following from James Madison in 1800, "just nine years after ratification of the First Amendment:"

> "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and

> demerits of the *candidates* for public trust, and on the equal
> freedom, consequently, of examining and discussing these merits
> and demerits of the candidates respectively." 4 J. Elliot, Debates
> on the Federal Constitution 575 (1861).

*Id.* at 687 (emphasis added); *see also Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 299 (1971) (holding that in respondent's "status as candidate for the office of county tax assessor, he fell within the same rule" regarding defamation about public officials (citing *Monitor Patriot Co.*, 401 U.S. 265)).

As previously noted, Tallman ran for local office in Boardman in November 2020, May 2021, November 2022, and May 2023. Also as previously noted, Miller posted the statement at issue in August 2023, and Tallman filed his lawsuit the next month, in September 2023. Had Miller posted her statement just three months earlier, sometime before the election in May 2023, there would be nothing about this issue that needs any further discussion. But at the time that Miller posted her statement, Tallman was not currently a candidate for any public office.

The relevant question, then, is whether, under the undisputed facts presented here, that distinction matters. The Court concludes that it does not. Between November 2020 and May 2023, Tallman ran for local office four times, literally once every year in the four years that immediately preceded Miller's posting. Further, there is no evidence to suggest that but for Miller's posting in August 2023, Tallman's repeated practice of running for office every year would not have continued. Thus, in August of 2023, Tallman was still a public figure, as a recent and perennial candidate for public office, and anything that might reasonably bear on his fitness for public office, including Miller's allegations, are protected under the rule established in *New York Times v. Sullivan*.

The situation might be different for someone who last ran unsuccessfully for public office several decades ago and then, several decades later, was the subject of allegedly defamatory

statements. Whether that person would still be a public figure raises a closer question, but it is one that the Court need not answer here. Under the undisputed facts presented, Tallman was a "general purpose" public figure[1] in August 2023 simply by virtue of his running for various public offices in November 2020, May 2021, November 2022, and May 2023.

Because Tallman was a "general purpose" public figure in August 2023, the next question relevant to Miller's motion to strike is whether Tallman has presented sufficient evidence of "actual malice" on the part of Miller, as that term is understood in the context of the *New York Times* rule. Because Judge Hallman did not reach that question, the Court remands this case back to Judge Hallman for consideration of that issue and anything else that may be relevant to the pending motion. Accordingly, the Court DECLINES TO ADOPT the Findings and Recommendation (ECF 27) to the extent that it recommends finding that Tallman is not a public figure. The Court also defers ruling on Defendant's motion to strike (ECF 6) and remands this matter back to Judge Hallman for further proceedings consistent with this Order.

**IT IS SO ORDERED**.

DATED this 25th day of October, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[1] A "general purpose" public figure is one who achieves "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).